## WALLING v. PEOPLES PACKING CO., Inc.

### No. 2571.

Circuit Court of Appeals, Tenth Circuit.

Dec. 16, 1942.

Milton C. Denbo, Atty., U. S. Dept. of Labor, of Washington, D. C. (Warner W. Gardner, Solicitor, and Mortimer B. Wolf, Asst. Solicitor, both of Washington, D. C., and Llewellyn B. Duke, Regional Atty., U. S. Dept. of Labor, of Dallas, Tex., on the brief), for appellant.

Solon W. Smith, of Oklahoma City, Okl. (James S. Twyford, of Oklahoma City, Okl., on the brief), for appellee.

Before PHILLIPS, HUXMAN, and MURRAH, Circuit Judges.

PHILLIPS, Circuit Judge.

The Administrator brought this action against the Peoples Packing Company, Inc.,[1] to enjoin it from violating the provisions of Sections 15(a) (1) and 15(a) (2) of the Fair Labor Standards Act of 1938, 52 Stat. 1060, 29 U.S.C.A. §§ 201–219.

From a judgment denying the relief sought, the Administrator has appealed.

The Peoples Company owns and operates a plant in Oklahoma City, Oklahoma, at which it engages in the slaughter of cattle and hogs and the manufacture of beef and pork products. The average number of its employees is approximately 45. From 4 to 7 are employed in the slaughtering department. The work in that department may be described as follows: Hogs are driven into the slaughtering pen. A hog is shackled and hung on hooks. It is then slaughtered, scalded, shaved, and washed. The carcass is then opened and the intestines and other inedible portions of the carcass are removed. The carcass is then sent to the cooling room. Cattle are driven into a chute, slaughtered, and allowed to bleed thoroughly. The hide is removed, the carcass is opened, and the inedible portions are removed from the carcass. The carcass is then split and sent to the cooling room. When a carcass is sent to the cooling room, the work of the department is completed.

While the primary object of the work of the employees in the slaughtering department is to produce edible meat and meat products, the major portion of their manual efforts is exerted in the removal of the hides and the inedible portions from the carcasses, thereby producing valuable by-products.

All of the Peoples Company's edible meat products are sold in Oklahoma for local consumption. Since February, 1940, all the offal, consisting of the heads, head bones, horns, feet, hoofs, and intestines of the slaughtered animals, has been sold to the Butcher Packing Company[2] of Oklahoma City. Its plant is located about 150 feet from the plant of the Peoples Company. The Butcher Company commingles the offal with offal purchased from others and produces tankage and grease therefrom. Offal from animals slaughtered by the Peoples Company amounts to many thousand pounds monthly and constitutes about 20 per cent of the offal handled by the Butcher Company. The Butcher Company ships large quantities of grease out of the state to the Procter & Gamble Company, a large soap manufacturer. There are no soap factories in Oklahoma. The out-of-state shipments of grease are carried in tank trucks to a railroad siding located about one block from the plants of the Peoples Company and the Butcher Company, and the grease is pumped into railroad tank cars.

The Butcher Company also sells large quantities of grease to the Cato Oil & Grease Company[3] in Oklahoma City. The Cato Company uses such grease to make lubricants and ships the major portion of such lubricants out of Oklahoma.

Prior to February, 1940, the Peoples Company sold its offal to the Oklahoma Rendering Company.[4] It constituted 8 to 10 per cent of the offal handled by the Rendering Company. The Rendering Company shipped 80 per cent of its tankage and 100 per cent of its grease to purchasers located outside of Oklahoma.

The Peoples Company sells its hides to E. W. Gruendler & Company[5] of Oklahoma City. The hides are removed from the Peoples Company's plant daily in their original green condition and transported by truck of the Peoples Company to Gruendler. Gruendler pays for the hides on delivery. There is only one leather tannery in Oklahoma. Gruendler purchases hides from slaughtering plants all over Oklahoma and ships 90 to 95 per cent of the hides out of the state.

The hides and offal represent from 3 to 4 per cent of the value of the carcasses

---

[1] Hereinafter called the Peoples Company.

[2] Hereinafter called the Butcher Company.

[3] Hereinafter called the Cato Company.

[4] Hereinafter called the Rendering Company.

[5] Hereinafter called Gruendler.

and constitute about 45 per cent thereof in weight.

The Peoples Company's gross income from the inedible portions of slaughtered animals was approximately $26,000 in each of the years 1939 and 1940, and approximately $19,000 for the first seven months of 1941.

■ The Act prescribes minimum wages and maximum hours for employees engaged in the production of goods for commerce.

It defines commerce as "trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof."

■ The Supreme Court has set at rest any question as to the constitutionality of the Act.[6] The question here presented is whether a particular phase of industrial activity is within the scope of the Act. Specifically it is whether the Peoples Company's employees engaged in the slaughtering of livestock and in removing the inedible portions of the carcasses are engaged in the production of goods for commerce.

The wide scope of the Act is demonstrated by two decisions of the Supreme Court handed down after the decision was rendered below.

In Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 1121, 86 L.Ed. 1638, the question was whether employees engaged in the operation and maintenance of buildings leased to tenants principally engaged in the production of clothing for interstate commerce were engaged in the production of goods for commerce. The employees involved were engineers, firemen, elevator operators, watchmen, porters, carpenters, and electricians employed by the owner of the building. The court held that the work of such employees "had such a close and immediate tie with the process of production for [interstate] commerce, and was therefore so much an essential part of it, that the employees" should "be regarded as engaged in an occupation 'necessary to the production of goods for commerce.'"

In Warren-Bradshaw Drilling Co. v. Hall, 63 S.Ct. 125, 87 L.Ed. ——, decided November 9, 1942, the employer was an independent drilling contractor. It was employed by oil producers to drill oil wells with a rotary drill to an agreed depth short of the oil sand. The wells were then completed by another driller with a cable drilling outfit who either brought in the well as a producer or demonstrated it was a dry hole. The court held that the employees of the drilling contractor engaged in carrying out the rotary drilling operation were engaged in a "process or occupation necessary to the production" of oil.

Sec. 3(i) of the Act in part reads: "'Goods' means goods * * *, wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, * * *."

Sec. 3(j) of the Act in part reads: "'Produced' means produced, * * * handled, or in any other manner worked on in any State; and for the purposes of this Act [chapter] an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, * * * handling, * * * or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State."

■ In order to produce the tanned hide and the leather products made therefrom, it was necessary to slaughter the animal and remove the hide, and in order to produce the tankage and grease and the fertilizers, lubricants, and soaps made therefrom, it was necessary to slaughter the animal and separate the offal from the edible portions of the carcass. Clearly, the employees in question were employed in handling the hides and offal and in an occupation necessary to the production of the tanned hides, fertilizers, lubricants, and soap.

■ Admittedly, where the work of the employee in question has only a tenuous relation to the production and is not in any real sense necessary thereto, the employee is not engaged in the production of goods or in handling or working thereon. Here, however, the tanned hides, the fertilizers, the lubricants, and the soap resulting from the processing of the hides and the offal could never have been produced had not the Peoples Company em-

---

[6] United States v. Darby, 312 U.S. 100, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A. L.R. 1430; Opp Cotton Mills v. Administrator, 312 U.S. 126, 657, 61 S.Ct. 524, 85 L.Ed. 624.

ployees removed the hides from the slaughtered animals and separated and recovered the offal from the carcasses. They performed the first step in the series of operations that produced the articles that went into commerce. They worked on the carcasses and they removed and handled the hides and offal, the original products from which the processed articles resulted. We conclude that the employees in question were engaged in the production of goods for commerce and in the handling and working on such goods.

■■■ The Act makes no distinction as to the volume or amount of shipments in commerce or in production for commerce by any particular shipper or producer. Its policy is to exclude from commerce all goods produced for such commerce which do not conform to the specified labor standards.[7] Nor is it material that 96 per cent of the value of the carcasses went into meat products which were sold in intrastate commerce, so long as a substantial amount of hides and offal was processed into products which reached the channels of commerce.[8] If, as was held in United States v. Darby, 312 U.S. 100, 123, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430, the Act applies to a small producer, it must equally apply to the production for commerce of a small portion of the total production of a large producer.[9] It is immaterial from the viewpoint of national concern in protecting interstate commerce and preventing its channels from being used to spread sub-standard labor conditions by competitive pressure, to the injury of that commerce, that the shipments in such commerce do not consist of the major product of the producer. Manifestly, one employer may send into commerce as a by-product a quantity of goods which greatly exceeds the principal production of other employers. When goods are produced for commerce under sub-standard labor conditions, whether

from products or from by-products, the effect upon commerce is the same.[10]

■■ Moreover, the fact that the employees in question are engaged in the production of goods both for intrastate and interstate commerce does not exempt their labor conditions from federal regulatory power. Congress has power to regulate intrastate transactions which are so commingled with or related to interstate commerce that all must be regulated if the interstate commerce is to be effectively controlled.[11]

Sec. 13(a) of the Act in part reads: "The provisions of sections 6 and 7 [sections 206 and 207 of this title] shall not apply with respect to * * * (2) any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce; * * *."

■ Clearly, the slaughtering department was not a service establishment. It was not selling or furnishing services to consumers.[12] It was a processing operation. It started with the live animal. It embraced the killing of the animal, the removal of the hide and offal, the separation of the edible from the inedible portions of the carcass, and the complete preparation of the carcass for the cooling room. Whether viewed from the standpoint of the meat products or the by-products it constituted the first operation in the processing and producing of meat products and of leather, fertilizers, soaps, and lubricants.

■ Finally, while the Peoples Company disposed of the inedible portions of the carcass after their separation, and had nothing to do with the subsequent processing thereof, it removed the hide and the offal and sold them to others under facts and circumstances clearly showing it intended or expected them, after further processing, to move in interstate

[7] United States v. Darby, 312 U.S. 100, 121, 123, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430.

[8] Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 467, 58 S.Ct. 656, 82 L.Ed. 954; National Labor Relations Board v. Fainblatt, 306 U.S. 601, 607, 307 U.S. 609, 59 S.Ct. 668, 83 L.Ed. 1014.

[9] The Act, of course, does not apply to the employees of the Peoples Company not engaged in production for commerce.

[10] Cf. Crompton v. Baker, 220 N.C. 52, 16 S.E.2d 471.

[11] United States v. Darby, 312 U.S. 100, 121, 122, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430; Houston, E. & W. Texas Ry. Co. v. United States (The Shreveport Case), 234 U.S. 342, 351, 352, 34 S.Ct. 833, 58 L.Ed. 1341.

[12] See Kirschbaum Co. v. Walling, 316 U.S. 517, 526, 62 S.Ct. 1116, 86 L.Ed. 1638.

commerce. They were, therefore, produced for commerce within the meaning of the Act.[13]

The judgment is reversed and the cause remanded with instructions to grant the injunction.

[13] United States v. Darby, 312 U.S. 100, 117, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430; Warren-Bradshaw Drilling Co. v. Hall, 63 S.Ct. 125, 87 L.Ed. ——, decided November 9, 1942.