KENNY TRINTA ET AL., Petitioners, *v.* SUPERIOR COURT OF PUERTO RICO, SAN JUAN PART, MIGUEL A. VELÁZQUEZ RIVERA, JUDGE, Respondent; C. BREWER PUERTO RICO, INC., Intervener.

No. C-62-74. Decided February 20, 1963.

380

*Vicente Géigel Polanco* and *Vicente Géigel Lanuza* for petitioners. *Sifre & Ruiz-Suria* and *Baltazar Corrada del Río* for intervener. *José Bosch Roqué, David E. Blum* and *Félix V. De Jesús,* counsel for the United States Department of Labor, as amicus curiae.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Ramírez Bages.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

Plaintiffs-petitioners Kenny Trinta *et al.* appeal to this Court by way of certiorari seeking review of the order of July 30, 1962 of the Superior Court, San Juan Part, which declared that the provisions of the Federal Fair Labor Standards Act—29 U.S.C.A. § 201 *et seq.*—do not cover petitioners and that the hours between 40 and 48 hours a week worked by them for intervener C. Brewer Puerto Rico, Inc. must be compensated at the regular rate.

In two separate complaints petitioners allege that all of them had rendered services to intervener during the crop season in work connected with the refining of sugar. Sixty-seven rendered services during the crop seasons from 1949 to 1958, two from 1955 to 1958, and one from 1956 to 1958. They claim the payment corresponding to the hours worked in excess of 40 and up to 48 hours a week at the wage rate of time and a half agreed upon for regular hours, such hours having been compensated at the regular rate.[1] Sixty-five petitioners also claim the payments corresponding to the differences between the wages received and the highest legal minimum wage prevailing in Puerto Rico under Act No. 96 of June 26, 1956 (Sess. Laws, p. 622) and the applicable mandatory decrees. As respects the claim for pay for extra hours, petitioners rely on Act No. 379 of May 15, 1948 (Sess. Laws, p. 1254), particularly on § 5 thereof which provides: "Every employer who employs or permits an employee to work during extra hours shall be obliged to pay him for each extra hour a wage rate equal to double the rate agreed upon

---

[1] This compensation is unquestionably in conformity with Mandatory Decree No. 3—29 R.&R.P.R. § 245n-21 *et seq.*—and with the holding in 1959 of this Court in *Laborde* v. *Eastern Sugar Associates*, 81 P.R.R. 468 (1959).

for regular hours; *Provided, however,* That every employer in any industry in Puerto Rico covered by the provisions of the Fair Labor Standards Act enacted by the Congress of the United States of America on June 25, 1938, as heretofore or hereafter amended, shall be under obligation to pay only for each hour of work in excess of the legal eight-hour working day, or in excess of forty (40) hours a week, a wage at the rate of not less than time and a half the rate of wage agreed upon for regular hours, save when by a decree of the Minimum Wage Board or by a collective labor agreement, other working and/or compensation standard is heretofore or hereafter fixed. To determine the wage rate agreed upon for regular hours of work, the daily, weekly, or monthly wages, or wages otherwise stipulated, shall be divided by the number of regular hours worked during that same period in accordance with the provisions of this Act." (29 L.P.R.A. § 274.)

It was alleged in the complaints that intervener's sugar refinery is an industry of Puerto Rico covered by the provisions of the Federal Fair Labor Standards Act—29 U.S.C.A. § 201 *et seq.*—and that, therefore, the work performed by petitioners was covered by the provisions on extra pay of the said Act and of § 5 of Act No. 379 copied above. As special defenses intervener herein alleged that every claim for services rendered up to June 1, 1955 has prescribed, and further— thereby giving rise to this petition—that in the sugar refinery operated by intervener sugar is refined exclusively for sale in the local market, wherefore the work performed by plaintiffs is not covered by the provisions of the Federal Fair Labor Standards Act nor by the *Proviso* clause of § 5 of Act No. 379 of 1948.

At the hearing set to argue the questions of law raised by the parties the trial court ordered that an inspection be conducted, and by order of March 14, 1962 it granted to the parties a period to submit to the court, for approval, a proposal of findings of fact based on such inspection. By mutual agree-

ment the parties submitted the proposal and after studying the same the trial judge issued the order from which this appeal is taken.[1a]

For the purpose of reviewing the order appealed from, it is necessary to make a complete exposition of the findings stipulated by the parties on the situation of fact existing in respondent's enterprise. The findings of fact stipulated by the parties are the following:

"The raw sugar, which is the raw material of the refinery, is pumped mechanically through a conduit from the adjacent raw-sugar processing plant to a tank steel-yard having a capacity of 15,000 pounds which is equipped for recording the weight. Samples of sugar of each weighing are taken in this station and together with the record of the weighing they are sent to the laboratories to be analyzed and recorded.

"After the sugar is weighed it passes through another conduit to a bucket sugar elevator. The sugar elevator forces the sugar to certain first-treatment tanks.

"The sugar is dissolved in the first treatment tanks and is treated with calcium hypochlorite (sucro blanc), phosphoric acid and calcium. The intervention of the first refinery employee, who is the operator of these tanks, takes place in these first-treatment tanks.

"A liquor is produced in these tanks after the raw sugar is dissolved. This liquor passes through a shaking screen and an aerator which aerates it until it reaches the clarifying station. Another refinery employee works in the shaking screen.

"The clarifiers heat the liquor, separate some impurities carried in the foam, and clarify the liquor which is continuously shaken. Another employee works in the clarifiers.

"The clarified liquor passes to the second-treatment tanks. An additional portion of calcium hypochlorite (sucro blanc), vegetable charcoal, sodium hydrosulphite and the filtering agent is added in the second-treatment tanks. Another employee works in these tanks.

---

[1a] Neither the claim for wages lower than the minimum nor the defense of prescription originally invoked by intervener poses any controversy calling for decision in this appeal.

"The treated liquor is pumped through the filters. There are five filters. Four filters are used for the first filtration and the fifth is used for the second filtration. A crust or scum remains in the filter sheets. This crust or scum is washed in order to remove all the sugar, testing the water until it shows zero Baumé (Baumé is an instrument which shows solid matter being dissolved and measures the amounts of solid matter dissolved in the liquid). Another employee works in the filters.

"The crust or scum is removed from the filters and pumped through pipes to the Oliver filters of the raw-sugar processing factory where it is thrown away as waste matter of the refinery. The crust or scum consists of residue such as charcoal, filtering matter, soil, trash, bagasse and other impurities.

"After the liquor is filtered, it passes to the tanks at the pan station. The filtered liquor is concentrated in the pans in order to crystalize the sugar. This concentrated product is a sort of syrup mixed with sugar crystals. This mixture is called 'massecuite' or 'strike'. A professional sugar technologist works in the pans and an assistant or peon helps him in the work.

"The massecuite passes to the centrifugal station where the sugar is separated from the syrup. Another employee works in the centrifugal station.

"The sugar obtained passes to certain tanks and from there to driers and coolers. After undergoing that process the sugar passes to the packing station where it is placed in paper bags under the trademark of 'Blanquita.' There is a group of employees in the packing station.

"After the sugar is packed it is transported to a warehouse which is about 50 meters distant, in a separate building.

"Regarding the syrup which remained in the centrifuges after the sugar is separated, the next process is this: the syrup is pumped again to the pan tanks. Another massecuite which is produced in the pans is submitted to the process above described. Again the sugar is separated from the syrup. This process is repeated about four times until the resulting syrup is completely clear of sugar crystals.

"After the content of sugar crystals is completely removed, the resulting syrup is called 'liquor returned' or 'return liquor.' This is a highly concentrated and purified saccharin liquor having no commercial value.

"This 'return liquor' is pumped from the centrifuges to a steelyard. The liquor is weighed in this steelyard by a refinery employee. A sample thereof is taken and analyzed in the laboratory. After this is done, the liquor is pumped mechanically through pipelines to the raw-sugar factory about 60 feet distant, where it is incorporated in the initial stage of the raw-sugar and molasses manufacturing process.

"—B—

"The raw sugar entering the refinery is weighed and analyzed and its equivalence on the basis of sugar of 96 degrees of polarization is determined. The 'return liquor' is weighed and analyzed and its equivalence on the basis of sugar of 96 degrees of polarization is determined. The refinery pays to the raw-sugar factory for the raw sugar used for refining purposes. In order to determine the amount payable, the amount of raw sugar is determined on the basis of its equivalence of sugar of 96 degrees of polarization which was pumped to the refinery, weighed and analyzed. What the refinery returned to the raw-sugar factory as 'return liquor' is deducted from the resulting amount, the equivalence of such liquor being determined on the basis of sugar of 96 degrees of polarization.

"—C—

"The equipment used in the sugar-refining process is not used in the processing of raw sugar and molasses, there being different equipment for each process.

"—D—

"The employees who work in the refinery do not work in the raw-sugar and molasses processing factory.

"—E—

"The raw-sugar and molasses factory as well as the refinery are situated within the same building.

"—F—

"The centrifuges of the raw-sugar and molasses processing plant are situated at a distance of about five to six feet from the aerator of the refining plant, this being the shortest distance between the equipment of both plants.

**"—G—**

"The raw-sugar and molasses factory and the refinery adjoin at two places: (1) the pipelines which carry the raw sugar to be used by the refinery to the tank steelyard where it is weighed, and (2) the pipelines which carry the 'return liquor' from the steelyard where it is weighed to the raw-sugar and molasses factory.

**"—H—**

"The volume of 'return liquor,' as compared with the total of blackstrap molasses for exportation produced in the raw-sugar factory, ranges between 0.7 per cent to 1.5 per cent.

**"—I—**

"The 'return liquor' is not necessary in the processing of raw sugar and molasses, and it is used in the raw-sugar and molasses manufacturing process because it contains saccharin. Such liquor has no commercial value to defendant.

**"—J—**

"The electric energy which drives the equipment of the raw-sugar and molasses factory as well as the refinery is generated by the same electric plant the boilers of which are situated in the raw-sugar and molasses factory. Defendant pays to the boiler operators the wages correspoding to the raw-sugar and molasses factory, and none of them is a claimant in the above-entitled cases."

■ As ground for their contention that the hours worked in excess of 40 and up to 48 should be compensated at time and a half, plaintiffs allege that, pursuant to the holding in *Olazagasti* v. *Eastern Sugar Associates,* 79 P.R.R. 88 (1956), § 7(c) of the Federal Fair Labor Standards Act [2] was adopted as local law of Puerto Rico in drafting and

---

[2] Section 7(c) of the Federal Fair Labor Standards Act provides in its pertinent part:

"(a) Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours, unless such employee receives compensation

promulgating Mandatory Decree No. 3 for the sugar industry of our Island. Petitioners are right in this part of their argument. As stated by this Court in *Pan American* v. *Superior Court*, 86 P.R.R. 132 (1962), "the Federal Fair Labor Standards Act prevails in Puerto Rico with all its provisions, except that our Legislative Assembly imposed on the employers covered by said Act or included within the exemptions of § 13, 29 U.S.C.A. § 213, the obligation to pay to their employees the time worked in excess of eight hours daily and forty hours weekly, at least, at time and a half, or at a higher rate, if it was so provided by a collective agreement negotiated by the parties or by a decree of the Minimum Wage Board applicable to the industry in question." This situation exists as a result of the *Proviso* clause of § 5 of Act No. 379 of 1948.

The provisions of the Federal Fair Labor Standards Act being applicable to the sugar industry of Puerto Rico, *Berríos* v. *Eastern Sugar Associates*, 79 P.R.R. 647 (1956), on the basis of the discussion on the relationship between the Federal Act, the *Proviso* clause of § 5, and Mandatory Decree No. 3 appearing in the *Olazagasti* case *supra*, it appears that the exemption from payment of extra hours of § 7(c) of the Federal Act is in full force during the crop season with respect to the production of raw sugar, but such exemption does not apply to the refining of sugar. However, the latter is conditioned on the fact that such activity result in the production of goods for commerce, that is, that in the specific

---

for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

" . . . . . . .

"(c) In the case of an employer engaged in the first processing of milk, buttermilk, whey, skimmed milk, or cream into dairy products . . . or in the processing of sugar beets, sugar-beet molasses, sugarcane, . . . into sugar (but not refined sugar) or into sirup, the provisions of subsection (a) of this section shall not apply to his employees in any place of employment where he is so engaged; . . ."

388

case of a particular refinery the sugar produced moves in the interstate or foreign commerce and is not sold exclusively in the local market, as is the case under consideration, unless for other reasons the employees in question may invoke, as they do invoke in this case, the benefits of the Fair Labor Standards Act. To that end petitioners maintain that: (1) their work was connected not only with the production of refined sugar but also with a sort of molasses known as "return liquor", which is a highly concentrated and purified liquor which is returned from the refinery plant to the raw-sugar processing plant where it is used as *a part or ingredient* in the process of manufacture of raw sugar, which is an article of interstate commerce and is therefore covered by the Federal Fair Labor Standards Act, and it has thus been determined by the Wage and Hour Division of the Federal Department of Labor; (2) intervener has not established in its Central Santa Juana complete and absolute segregation among the employees of the industrial plant, machinery, electric plant, pipelines and other equipment, as required by the regulations promulgated by the Administrator of that Act, since in the case of that Central the refining plant and the raw-sugar plant are housed under the same roof, are connected by pipelines which carry raw material from one to the other, and use a common electric plant.

In order that the employees of a particular enterprise may be entitled to the benefits granted by the federal statute, it is necessary that their activities comply with the principles or norms established by the Act itself limiting the area of its application. Otherwise stated, an employee must be engaged in commerce or in the production of goods for commerce, and he is deemed to be engaged in the production of goods for commerce if he is producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any closely related process or occupation directly essential to the production thereof, in any State. See

29 U.S.C.A. § § 206 and 207 and the definition of *"produced"* in § 203.

 It is obvious that under the first test of applicability of the Federal Fair Labor Standards Act—"engaged in commerce"—the refinery employees do not come within the coverage of that Act. Unlike the Federal Labor Management Relations Act the applicability of which is based on a much broader basis and the impact thereof is felt by those industries which merely affect [3] interstate commerce—29 U.S.C.A. § 141—the Fair Labor Standards Act operates in a more limited ambit affording protection to those employees who are "engaged in commerce or in the production of goods for commerce." 29 U.S.C.A. § § 206 and 207.[4] Basically, the employees who receive the benefits of the Federal Act under the authority of the phrase "engaged in commerce" are those who are engaged in, or whose work is related to the movement of persons or things (tangibles or intangibles and including intellectual information and material) among the several States or between any State and any place outside thereof. The Supreme Court of the United States has ruled in several cases that the applicability of the Act based on "engaged in commerce" extends to every employee employed in the *channels* of commerce or in activities so closely related

[3] See *Labor Board* v. *Reliance Fuel Oil Corporation*, 371 U.S. 224 (1963), where the application of the Federal Labor Relations Act is extended to a distributor of fuel oils who purchased them within the State of New York from a supplier who was concededly engaged in interstate commerce. This result was reached on the basis of the phrase "affecting commerce." See, however, *Parks* v. *Puckett, d.b.a. Proctor Potato Chip Co.,* 154 F. Supp. 842 (Ark. 1957), and *Campanale* v. *General Ice Cream Corp.,* 49 N.E.2d 1018 (Mass. 1943).

[4] See *Kirschbaum* v. *Walling*, 316 U.S. 517 (1942), where a comparative analysis is made of the difference between the scope of the Labor Relations Act and the Federal Fair Labor Standards Act. See, also, *Labor Board* v. *Reliance Fuel Oil Corporation, supra,* note 3, in which it is said that "in passing the National Labor Relations Act, Congress intended to and did vest in the Board the fullest jurisdictional breadth constitutionally permissible under the Commerce Clause."

390

to such commerce, as a practical matter, that they should be considered as a part thereof. *Walling* v. *Jacksonville Paper Co.*, 317 U.S. 564 (1943); *Boutell* v. *Walling*, 327 U.S. 463 (1946). Typically, under this principle are included employees of the telephone, telegraph, television, radio, transportation and shipping industries, since these industries serve as the actual channels of interstate and foreign commerce. Similarly, employees of such businesses as banking, insurance, newspaper publishing, and others which regularly utilize the channels of interstate commerce in the course of their operations are covered by the said Act. See the Interpretative Bulletin of the Wage and Hour Division issued in 1962, 29 C.F.R., Parts 776.8 to 776.11. Those employees who are regularly engaged in loading and unloading interstate shipments are also covered by the Federal Fair Labor Standards Act. The employees of warehouses and of certain wholesalers who are engaged in receiving goods in interstate commerce and in storing and guarding them are also covered. Clearly, the employees of the refinery in question, the output of which was sold exclusively in the local market, for local consumption, cannot be classified within any of the categories mentioned and it could not therefore be said that they are "engaged in commerce."

▉ One of the two questions to be decided in this petition is whether the fact that the refinery returns to the raw-sugar processing plant the so-called "return liquor" and that the latter is incorporated in the initial stage of the first manufacturing process warrants the conclusion that the refinery employees are engaged in the production of goods for commerce.

The burden of proof rests upon plaintiffs and should be satisfied by the evidence in the record. *Schulte* v. *Gangi*, 328 U.S. 108 (1946).

In support of their contention petitioners rely on the definition of the term "goods" appearing in § 3(i) of the Fed-

eral Fair Labor Standards Act. 29 U.S.C.A. § 203(i). That section speaks of "goods . . . or any part or ingredient thereof." According to their contention, the "return liquor" utilized in the manufacture of raw sugar—an article which moves in interstate commerce—becomes an ingredient of raw sugar and, consequently, the refinery employees are engaged in the production of goods for interstate commerce. It is true that those employees who are engaged in the production of certain goods which are then sold to local producers who utilize them in the production of goods "for commerce" are covered by the Federal Fair Labor Standards Act. *Roland Electrical Co.* v. *Walling*, 326 U.S. 657 (1946); *Walling* v. *W. D. Haden Co.*, 153 F.2d 196 (C.A. 5, 1946). See, also, the Interpretative Bulletin of the Federal Wage and Hour Division, Part 776.20(c); 29 C.F.R., Part 776.20. However, a majority of the cases which have upheld such conclusion deal with articles which are actually raw material or ingredients of, or necessary or closely related and essential to, the production of that which finally moves in interstate commerce. Part 776.20(c) of the Interpretative Bulletin, *op. cit. supra*, offers examples of these cases to which the Act applies, and reference is made to a manufacturer of buttons who sells them to a local manufacturer of shirts who in turn sells the shirts in the interstate commerce. Mention is also made of a lumber manufacturer who sells the lumber to a furniture manufacturer for interstate commerce. There is no question that the buttons as well as the lumber are real ingredients of the shirts and of the furniture, respectively. In *Romaca* v. *Meyer*, 250 P.2d 347 (Cal. 1952), an employee was engaged in the production of parts to go on radar units which were sold to an enterprise known as Dalmo-Victor where they were incorporated in the radar units, the latter being subsequently sold in interstate commerce. In upholding the applicability of the Federal Act, it was said at p. 349: "Without the parts worked on by plaintiff and sold by defendant to Dalmo-Victor there could have been no radar

units to be shipped to Westinghouse." Great importance was attached in this case to the fact that the parts were necessary for the production of radar units. See, also, as illustration of the general principle, the cases of *Roland Co.* v. *Walling, supra; Walling* v. *W. D. Haden Co., supra.*

In the instant case we are not concerned with the "return liquor" as respects the raw sugar, for according to paragraph I of the stipulation submitted by the parties the "return liquor" is not necessary for the processing of raw sugar and molasses.

The evidence, consisting of the stipulation copied hereinabove, shows that the "return liquor" has no commercial value; it is returned to the raw-sugar factory where it is incorporated in the initial stage of the raw-sugar and molasses manufacturing process; it is not necessary for the manufacture of raw sugar and molasses, and is utilized in that process because it contains saccharin. The volume of such "liquor," as compared with the total of blackstrap molasses for exportation produced in the raw-sugar factory, ranges from 0.7 per cent to 1.5 per cent, and if for the purposes of comparison there is added the volume of raw sugar for exportation produced by the factory, the proportion indicated is even much less. For the purposes of determining the amount to be paid for the raw sugar used as raw material in the refinery, the equivalent in such sugar of the "return liquor" is deducted from the equivalent in sugar of 96 degrees of polarization of the raw sugar. It is therefore evident that in incorporating such liquor at the initial stage of the processing of raw sugar, the intervener profits by saving the possible expense of throwing it away and by reducing the cost of raw sugar utilized as raw material in the refining. It has not been shown whether or not it receives any other benefits from the fact that the "liquor" utilized in the manner stated "is usable because it contains saccharin." However, the Act in question makes no provision with respect to

the benefit to the employer as basis for its application. On the contrary, in this case the material in question is not necessary for the production of the article in commerce—in this case, the molasses and the raw sugar—the volume of such material is very small as compared with the articles in question and the material is incorporated in the manufacturing process. However, the record fails to show how it aids, facilitates, or contributes in some way to carry out the process or becomes a part, ingredient, or is chemically or otherwise included in the molasses or in the raw sugar. Lastly, the record rather shows, by the manner of paying for the raw sugar which is used as raw material of the refinery, that the incorporation of the "liquor" in the initial stage of the processing of raw sugar has rather the character of a return of raw material to its original source.

The foregoing analysis of the evidence leads to the conclusion that petitioners have failed to establish that the "liquor" in question is a part or ingredient of the molasses or the raw sugar which is transported and sold outside of Puerto Rico, and, therefore, they have not been covered by the Fair Labor Standards Act because of the fact that they have been engaged in the processing of a product utilized as an ingredient in the production of the "liquor."

■ There remains for consideration the third rule or basis for determining the applicability of the Act to certain employees—namely, whether such employees are engaged in any "closely related process or occupation directly essential to the production of goods for commerce."

Before the Act was amended in 1949, it applied to those employees who were engaged in any process or occupation *necessary* for the production of goods for commerce. In 1949 the phrase "closely related process or occupation directly essential to production of goods for commerce," was substituted by the word "necessary." Under this amendment, in order to be entitled to the benefits of the Act an employee must be

engaged in a process or occupation which meets both requirements—namely, that it be closely related and also that it be directly essential. See Interpretative Bulletin, *op. cit. supra*, § 776.17. The result of such change has been to provide more specific guides in determining applicability and, consequently, to limit the scope of such applicability. *Mitchell* v. *H. B. Zachry Co.*, 362 U.S. 310 (1960); *Mitchell* v. *W. E. Belcher Lumber Co.*, 279 F.2d 789 (C.A. 5, 1960); *Mitchell* v. *Dooley Bros. Inc.*, 181 F. Supp. 312 (Mass. 1960); *Huke* v. *Ancilla Domini Sisters*, 267 F.2d 96 (C.A. 7, 1959); *Mitchell* v. *S.A. Healy Company*, 190 F.Supp. 897 (Ill. 1959); *Mitchell* v. *Jaffe*, 261 F.2d 883 (C.A. 5, 1958). Both concepts are independent of each other and a particular activity could be classified as "closely related" and yet not be "directly essential." There is a great number of factors to be considered in determining the close relationship contemplated by the Act, while the so-called "direct essentiality" is determined exclusively on the functional necessity which may appear from the relationship between the activity discharged by the employee in question and the production of the goods for interstate commerce. In *Kirschbaum* v. *Walling, supra*, footnote 3, in analyzing the foregoing broader test of "necessary to the production" the Federal Supreme Court established what became a well-followed test in determining that certain employees came within the Fair Labor Standards Act because of the fact that their work was intertwined with the process of production for commerce by a close and immediate tie. It was also said in that case at p. 523, and was reiterated in *10 East 40th St. Co.* v. *Callus*, 325 U.S. 578 (1945) : "Unlike the Interstate Commerce Act and the National Labor Relations Act and other legislation, the Fair Labor Standards Act puts upon the courts the independent responsibility of applying *ad hoc* the general terms of the statute to an infinite variety of complicated industrial situations." All of which indicates that the determination of whether a particular ac-

tivity is closely related or is directly essential to the production of goods for commerce is a question of degrees which must be reached after making an analysis of the facts of each case and bearing in mind the test introduced by the 1949 amendments.

The test of "closely related and directly essential" is generally applied to cover the so-called fringe production activities such as maintenance, clerical work, machinery repairs and the like which, though they do not constitute productive activities in the strict sense of the word, are so necessary to an efficient and continued production that, lacking the same, such production would not be possible. *Mitchell* v. *Hooper Equipment Co.*, 279 F.2d 893 (1960). See Interpretative Bulletin, *op. cit. supra*, § § 776.17 and 776.18. The relationship between the activity performed by the employee concerned and the production for interstate commerce, measured in physical as well as in functional terms, should not be remote nor tenuous. *Cf. Mitchell* v. *H. B. Zachry, supra; Mitchell* v. *Hygrade Water & Soda Company*, 285 F.2d 362 (C.A. 8, 1960) ; *Mitchell* v. *Belcher Lumber Co.*, 279 F.2d 789 (C.A. 5, 1960) ; *Walling* v. *Peoples Packing Co., Inc.*, 132 F.2d 236 (C.A. 10, 1942).

 In certain situations the scope of the phrase being analyzed has been extended to cover the interstate production of certain goods utilized in the production of goods for interstate commerce, whether as containers, fuel, tools, dies, etc. See Interpretative Bulletin, *op. cit. supra*, § 776.19. Thus, the employees of an ice manufacturing company which furnished ice to companies engaged in packing shrimp for interstate commerce, for the refrigeration of the shrimp, have been included as employees covered by the Act. *Mitchell* v. *Independent Ice & Cold Storage Company*, 294 F.2d 186 (C.A. 5, 1961). Emphasis was placed in this case on the fact that the ice was supplied to the shrimp companies at frequent and regular intervals and in substantial amounts. In *Tobin*

v. *Colby Cheese Box Co.*, 10 WH Cases 422 (Wis. 1951), the Federal Act was applied to the employees of a manufacturer of wooden boxes used as containers for cheese regularly sold in interstate commerce. It was said that the manufacturer of the boxes had reason to believe that such boxes would be shipped out of the State and also that the activities of the employees who manufactured the boxes were so closely related to the production of cheese that there was a close and immediate tie.

In connection with the foregoing, two additional doctrines which the Administrator of the Wage and Hour Division as well as the courts have followed for the purpose of establishing crystal-clear guides in determining the applicability of the Federal Act on the basis of the test of "closely related or directly essential" or of the former test of "necessary" which we have seen was broader, carry weight. In the first place, it is said that, despite the fact that the business of an employer who supplies certain goods to producers of goods for interstate commerce is essentially local, his employees will be covered by the Act if the employer had reasonable basis to anticipate that substantial amounts of his output would move in interstate commerce. *Cf. Shulte Co.* v. *Gangi, supra; Mitchell* v. *Hooper Equipment Company, supra; Mitchell* v. *Jaffe, supra; Tobin* v. *Celery City Printing Co.*, 10 WH Cases 682; *Walling* v. *Hammer*, 64 F. Supp. 690 (Va. 1946); *Romaca* v. *Meyer, supra.*

In the second place, applying the maxim of "*de minimis non curat lex,*" some courts have refused to apply the Federal Act to cover employees whose participation in the productive process for interstate commerce is of an inconsequent, trivial or infinitesimal degree. However, the generally accepted doctrine is that the volume or percentage of an employer's production which moves in interstate commerce is but one of the determinative factors in ascertaining the applicability of the Act. *Goldberg* v. *Worman*, 37 F. Supp. 778

(Fla. 1941). Relying on the doctrine announced in *Mabee* v. *White Plains Publishing Co.*, 327 U.S. 178 (1946), and on the fact that the Act in §§ 6 and 7 speaks of "each" and of "any" employee and in § 15(a) it prohibits the introduction in interstate commerce of "any" articles, on numerous occasions the courts have refused to apply the doctrine of *"de minimis."* *Mitchell* v. *Sucrs. de A. Mayol & Co.*, 166 F. Supp. 184 (P.R. 1958). On the other hand the general principle that courts are responsible for the construction of said Act in the light of the facts in each particular case have led the courts to invoke the doctrine of *"de minimis"* in certain justifiable cases. *Cf. Hunter* v. *Madison Avenue Corporation*, 174 F.2d 164 (C.A. 6, 1949); *Hill* v. *Jones*, 59 F. Supp. 569 (Ky. 1945); *Zehring* v. *Brown Materials*, 48 F. Supp. 740 (Cal. 1943).

From the foregoing considerations we conclude that petitioners cannot justify either the applicability of the Fair Labor Standards Act because they are engaged in "some process closely related or occupation directly essential" to the production of molasses and raw sugar which their employer, namely, the intervener, sells "in the commerce."

◼ The second ground alleged by petitioners is that intervener has failed to establish in its Central Santa Juana complete and absolute segregation among the employees of the industrial plant as well as of the machinery and other equipment. The evidence on this question, as it appears from the stipulation, shows that: (1) plaintiffs are not engaged in the production of raw sugar and molasses; (2) there was different equipment for the sugar-refining process and for the raw-sugar and molasses process (although both were under the same roof), except that the same electric plant supplied energy to operate both types of equipment; however, claimant laborers were not engaged in anything connected with that plant, so much so that the operators of the plant received the same wages corresponding to the raw-sugar and molasses

production; and, lastly, (3) the two factories were connected only by the pipelines which carried the raw sugar used in the refining production and the pipelines which carried the return liquor" to the raw-sugar factory. The alleged lack of segregation is therefore based on the existence of the roof and electric plant common to both factories, on the pipelines in question, and lastly, on the fact that part of the raw sugar produced was used as raw material for the refining. We have been unable to find any case supporting the contention that, in the light of the facts shown, the necessary absolute segregation which removes petitioners from the ambit of the Fair Labor Standards Act cannot exist. The cases decided on this question concern the nonsegregation in the laborers' own activities. The question of segregation, in our opinion, is determined on the basis of the nature of the workers' activities rather than exclusively on the basis of particular situations of the physical condition of the equipment and machinery and their situation, in connection with which petitioners were not engaged in any occupational activity. The fact that raw sugar which is sold in the interstate market is produced in a sugar mill in which another plant is located which by means of using part of said raw sugar, as raw material, produces refined sugar for the local market, does not by itself affect the character of the activity of the laborer who is engaged in the production of the refined sugar for the local market to the point of including him, on that fact alone, under the provisions of the Fair Labor Standards Act, unlike the situation in the case of the Labor Relations Act which, as already stated, has a broader and more sweeping scope than the former Act. *Cf. Kirschbaum* v. *Walling, supra,* footnote 4; *Labor Board* v. *Reliance Fuel Oil Corporation, supra,* footnote 3.

 In the case before us four reasons are given, in our opinion, to deny the applicability of the Federal Fair Labor Standards Act to the employees of the sugar refinery, to wit:

(1) the nature of the business and the main purpose of the production of refined sugar are essentially local, and neither the fact nor the intention has been shown that the refined sugar moves in some way in interstate commerce; (2) the "return liquor" is at the most a by-product,[5] and although it is true that it is incorporated in the initial stage of the process by the raw-sugar processing plant, it is not indispensable nor necessary for such process and it consists, in a certain sense, in a return of the raw material of the refinery to the raw-sugar and molasses plant; (3) the volume of "return liquor," as compared with the total of the blackstrap molasses for exportation produced in the raw-sugar factory, ranges from 0.7 per cent to 1.5 per cent (and unquestionably it would be less if the raw sugar were included in the comparison), thereby emphasizing the fact that it is unnecessary to the production; and (4) in the stipulation submitted by the parties it was established—and it was so determined by the trial judge—that there was complete segregation between intervener's local and interstate activities. *Cf. Agosto* v. *Rocafort*, 9 L.C., par. 62,610 (1945); *Carter* v. *Royal Crown Bottling Co., Inc.*, 7 L.C., par. 61,951 (1943); *Fleming* v. *Atlantic Co.*, 40 F. Supp. 654 (Ga. 1941). Furthermore, according to the stipulation submitted, petitioners in nowise intervened in the production of raw sugar for interstate commerce. The applicability of the Fair Labor Standards Act is determined, not by the nature of the employer's business, but by the character of the employee's activities. *Mitchell* v. *Hooper Equipment Company, supra; Mitchell* v. *Anderson*, 235 F.2d 638 (C.A. 9, 1955).

---

[5] *Goldberg* v. *Everbest Meat Products, Inc.*, 42 L.C., par. 31,133 (1961), upheld the applicability of the Federal Act to employees of a meat-processing company and by-products of which moved in interstate commerce after they were processed and were incorporated in other products by the purchasing processing companies. This case is distinguishable since here it was established that the "by-products" moved in interstate commerce as part of other products. *Cf. Mitchell* v. *P. R. Dehydrating and Feed Corp.*, 38 L.C., par. 66,024 (1959).

400

The concurrence of these facts, considered in the light of the principles announced hereinabove, leads to the inescapable conclusion that the employees of intervener's refinery are not covered by the Federal Fair Labor Standards Act. The order appealed from will therefore be affirmed.

ON MOTION FOR RECONSIDERATION
May 31, 1963

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

Petitioners, as well as the Department of Labor of the United States, as amicus curiae in this case, pray for reconsideration of the judgment of this Court of February 20, 1963 in the case at bar and to that end they allege:

(1) The mere showing that certain employees are engaged in the production of an article which moves in interstate commerce constitutes a prima facie case for the application of the test of "production of goods for commerce" contained in the Federal Fair Labor Standards Act. It was therefore unnecessary for the record to show the special value or special use of the return liquor. This argument is based on a wrong premise, since the record failed to show that the refinery employees were engaged in the production of an article which moves in interstate commerce. *Schulte* v. *Gangi*, 328 U.S. 108 (1946). (2) In including the term ingredient in the definition of "goods for commerce" contained in § 3(i) of the Fair Labor Standards Act (29 U.S.C.A. § 203(i)) no limitation was indicated, wherefore the mere fact that a substance is mingled with another in interstate commerce is sufficient to render the Act applicable. In other words, that the role which the return liquor plays in the raw-sugar manufacturing process is immaterial and irrelevant. In support of the foregoing, the following cases are cited, among others: *Mitchell* v. *Royal Baking Company*, 219 F.2d 532 (C.A. 5, 1955); *Walling* v. *W. D. Haden Co.*, 153 F.2d

196 (C.A. 5, 1946); *Reynolds* v. *Salt River Valley Water Users Ass'n*, 143 F.2d 863 (C.A. 9, 1944); *Walling* v. *Peoples Packing Co.*, 132 F.2d 236 (C.A. 10, 1942); *Warren Bradshaw Drilling Co.* v. *Hall*, 124 F.2d 42 (C.A. 5, 1951). An examination of the opinions rendered in these cases shows that the court in each of those cases took into consideration precisely the role played by the article involved in the production of the article which moved in interstate commerce. Let us see.

In *Mitchell* v. *Royal Baking Company*, *supra*, it was held that certain employees of a manufacturer of bakery products which were sold to certain local establishments which used them in preparing sandwiches for sale to airlines were covered by the Fair Labor Standards Act. Some of the products were unaltered in interstate commerce. In applying the Federal Act *supra* the court stressed the fact that Hot Shoppe Caterers (one of the purchasers) was "a regular purchaser of substantial amounts of bakery products." The annual sales to the purchaser amounted to $57,400.51 in bakery products and 30 per cent of this amount was used for flight meals.

In *Walling* v. *W. D. Haden Co.*, *supra*, it was held that the Federal Act covered the employees of an enterprise which sold oyster shells used in manufacturing lime and fertilizer sold in interstate commerce, since the oyster dealer manufactured lime and cement directly from this product, that is, that the oyster in this case was the raw material used in the production of lime and cement, and that he used it as catalytic agent in the production of magnesium.

The amicus curiae argues that even the water which is ordinarily considered as having no intrinsic value has been classed as goods, according to the statutory definition. To this end, it cites the case of *Reynolds* v. *Salt River Valley Water Users Ass'n*, *supra*, in which it was held that the Federal Act covered the employees of a water association which

furnished water to shareholder farmers who operated in a valley. However, in order to justify the scope of that Act, the court stated as follows at p. 867: "*Here the irrigating water is not only a causa sine qua non but one of the several proximate causes of vegetable growth. Its intimate immediacy is obvious.*" (Italics ours.)

*Walling* v. *Peoples Packing Co., supra,* upholds the applicability of the Federal Act in question to certain employees of a company which sells cattle offal locally to be shipped later by the purchasers in the interstate commerce in the original condition, or altered, namely, as raw material in the production of soap, fertilizers and lubricants. The court concluded at p. 239:

"*. . . Here, however, the tanned hides, the fertilizers, the lubricants, and the soap resulting from the processing of the hides and the offal could never have been produced had not the Peoples Company employees removed the hides from the slaughtered animals and separated and recovered the offal from the carcasses.*" (Italics ours.)

Lastly it cites *Warren Bradshaw Drilling Co.* v. *Hall, supra,* in support of the theory that the Federal Act *supra* covers the production of certain goods which move in the channels of commerce in their unaltered condition, undergoing alterations or as parts or ingredients of other goods. This case does not illustrate the principle announced. The employees in this case were members of crews engaged in drilling oil wells for others. The oil moved in interstate commerce. The court held that they were engaged in the production of goods for commerce. The court said at p. 44 of its opinion:

". . . In the practical operation of the oil business, no one would accept the view that rotary drilling is not a part of the production of oil and that rotary drilling crews are not a part of the field forces actually engaged in its production."

The same amicus curiae raises two other questions: first, it alleges that the rule of "*de minimis*" is no criterion for de-

ciding a case such as this; and second, it attacks our theory that the return of the return liquor is in the nature of a restitution of raw material of the refinery to the raw-sugar and molasses processing plant. In the first issue it is right in principle. However, the mention of that rule was not decisive in our opinion. We merely said that the fact of the small amount of the volume of liquor returned as compared with the total of the blackstrap molasses emphasized the needlessness of the former for the production of the latter. Regarding the second issue, the opinion does not decide that the return of the return liquor was a restitution of raw material, but that it partook in a certain sense of that nature.

In its brief the amicus curiae maintains that the result of the amendment of the Act in 1949, substituting the phrase "closely related or directly essential" by the word "necessary" formerly used in the Act, was to enlarge its scope. Such scope was certainly enlarged, but it was in the sense that after the amendments the Act covers clearly the so-called fringe productive activities such as maintenance, clerical work and repairs. *Mitchell* v. *Hooper Equipment Co.*, 279 F.2d 893 (C.A. 5, 1960). However, as stated in our opinion, on p. 394, the net result as to employees engaged in the production properly was to limit the scope of the Act by providing more specific guides. See Interpretative Bulletin of the Federal Wage and Hour Division, 29 C.F.R., Part 776.17. Anyway, the fact is that the consequences of these amendments were discussed in the opinion, not as a basis for determining definitively that the return liquor was not an ingredient, but rather as an indicative sign or interpretative guide.

Petitioners, on their part, argue that it is generally known that the value of a product in the manufacture of sugar depends on its sweetening property and that the return liquor is a highly concentrated product containing saccharin, a substance which according to the definition of the ency-

clopedia has the property of sweetening hundreds of times its sugar weight. The fallacy of this argument is that petitioners failed to show the effect of saccharin in the return liquor. Although we can take cognizance of the fact that saccharin is a powerful sweetener, we cannot take cognizance of the fact that the necessary consequence of restoring the return liquor to the initial raw-sugar process was to facilitate in some way, or to be necessary or essential to, or to be closely related to, the production of raw sugar, for although it was said that such liquor is usable in the raw-sugar manufacturing process because it contains saccharin, the parties stipulated, however, that such liquor was not necessary for the production of sugar.

In view of the foregoing, we reiterate that the mere incorporation of the return liquor in the initial stage of the raw-sugar and molasses manufacturing process, without further showing of its essentiality or intimate relation to the raw-sugar manufacturing process, is no reason on which to base the applicability of the Fair Labor Standards Act.

The motion for reconsideration is denied.