KENNY TRINTA Y OTROS, BENJAMÍN LARA Y OTROS, peticionarios, *v.* TRIBUNAL SUPERIOR DE PUERTO RICO, SALA DE SAN JUAN, HON. MIGUEL A. VELÁZQUEZ RIVERA, JUEZ, demandado; C. BREWER PUERTO RICO, INC., interventora.

*Número:* C-62-74 *Resuelto:* 20 de febrero de 1963

402

*Vicente Géigel Polanco* y *Vicente Géigel Lanuza,* abogados de los peticionarios; *Sifre & Ruiz-Suria* y *Baltazar Corrada del Río,* abogados de la interventora; *José Bosch Roqué, David E. Blum* y *Félix V. De Jesús,* abogados del *amicus curiae,* el Secretario del Departamento del Trabajo de Estados Unidos.

Sala integrada por el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Blanco Lugo y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

Acuden ante este Tribunal los demandantes-peticionarios Kenny Trinta y otros, en recurso de certiorari solicitando se revise la resolución del Tribunal Superior, Sala de San Juan, de 30 de julio de 1962 que declaró que las disposiciones de la Ley Federal de Normas Razonables de Trabajo —29 U.S.C.A. sec. 201 *et seq.*—no cubren a dichos peticionarios, y que las horas entre cuarenta y cuarenta y ocho a la semana trabajadas por ellos para la interventora, C. Brewer Puerto Rico, Inc., deben compensarse a tipo sencillo.

En dos querellas separadas alegaron los peticionarios que todos habían prestado servicios para la interventora durante períodos de zafra en labores relacionadas con el refinado de azúcar. Sesenta y siete prestaron dichos servicios durante las zafras entre 1949 y 1958, dos desde 1955 a 1958 y uno desde 1956 a 1958. Reclaman el pago correspondiente por las horas trabajadas en exceso de 40 y hasta 48 semanales, a razón de tiempo y medio del tipo de salario convenido para las horas regulares, habiendo sido compensadas dichas horas a tiempo sencillo.[1] Sesenta y cinco de los peticionarios reclaman, además, los pagos correspondientes por diferencias entre los salarios percibidos y el salario mínimo legal más alto vigente en Puerto Rico bajo la Ley Núm. 96 de 26 de junio de 1956 y los decretos mandatorios aplicables. En cuanto a la reclamación de paga por horas extras descansan los peticionarios en la Ley Núm. 379 de 15 de mayo de 1948, especialmente en su Art. 5 que dispone: "Todo patrono que emplee o permita que trabaje un empleado durante horas extras vendrá obligado a pagarle por cada hora extra un tipo de salario igual al doble del tipo convenido para las horas regulares; *Disponiéndose,* sin embargo, que todo pa-

---

[1] Esta compensación indudablemente está en armonía con el Decreto Mandatorio Núm. 3—29 R.R.P.R. secs. 245n-21 *et seq.*—y con lo reiterado en 1959 por este Tribunal en *Laborde* v. *Eastern Sugar Associates,* 81 D.P.R. 478 (1959).

trono de una industria de Puerto Rico cubierta por las disposiciones de la Ley de Normas Razonables de Trabajo, aprobada por el Congreso de Estados Unidos de América en 25 de junio de 1938, según ha sido o fuese subsiguientemente enmendada sólo vendrá obligado a pagar por cada hora de trabajo en exceso de la jornada legal de ocho (8) horas o en exceso de cuarenta (40) horas a la semana un tipo de salario a razón de, por lo menos, tiempo y medio del tipo de salario convenido para las horas regulares, salvo el caso en que por decreto de la Junta de Salario Mínimo, o convenio colectivo de trabajo se haya fijado o fijare otra norma de trabajo o de compensación, o de ambas. Para determinar el tipo de salario convenido para horas regulares de trabajo, se dividirá el salario diario, semanal, mensual, o en otra forma estipulado, por el número de horas regulares que se trabaje durante ese mismo período de acuerdo con las disposiciones de esta Ley." (29 L.P.R.A. sec. 274.)

Se alegó en las querellas que la refinería de azúcar de la interventora es una industria de Puerto Rico cubierta por las disposiciones de la Ley Federal de Normas Razonables de Trabajo—29 U.S.C.A. sec. 201 *et seq.*—y que por lo tanto las labores rendidas por los peticionarios estaban sujetas a las disposiciones de paga por horas extras de la referida ley y del Art. 5 de la Ley Núm. 379 antes transcrito. Como defensas especiales alegó la aquí interventora que toda reclamación por concepto de servicios prestados hasta el día primero de junio de 1955 está prescrita y además—motivando así el presente recurso—que en la refinería de azúcar que opera la interventora se refina exclusivamente azúcar que se vende en el mercado local, no estando, por lo tanto, cubiertas las labores que han realizado los querellantes por las disposiciones de la Ley Federal de Normas Razonables de Trabajo ni por el *Disponiéndose* del Art. 5 de la Ley 379 de 1948.

En la audiencia señalada para argumentar las cuestiones de derecho suscitadas por las partes, el tribunal de ins-

tancia ordenó que se practicara una inspección ocular y por resolución de 14 de marzo de 1962 fijó a las partes un plazo para someter a la aprobación del tribunal un proyecto de conclusiones de hechos basadas en tal inspección. De común acuerdo, las partes sometieron el referido proyecto y luego de estudiarlo el juez sentenciador emitió la resolución contra la que se interpone el presente recurso.[1-a]

Para los efectos de revisar la resolución recurrida es necesario hacer una exposición completa de las conclusiones estipuladas por las partes sobre la situación de hecho existente en la empresa de la querellada. Dichas conclusiones sobre hechos aceptadas por las partes son las siguientes:

"El azúcar crudo, que es la materia prima de la Refinería, es bombeada mecánicamente desde la Planta de elaboración de azúcar crudo adyacente, a través de un conducto hasta una romana-tanque de 15,000 libras de capacidad y equipada con equipo para imprimir el récord de la pesada. En esta estación se toman muestras de azúcar representativas de cada pesada y las muestras con el récord de pesadas son enviadas a laboratorios para análisis y récord.

El azúcar, una vez pesada, pasa a través de otro conducto hasta un elevador de azúcar tipo 'bucket'. El elevador de azúcar impulsa el azúcar hasta unos tanques de primer tratamiento.

En los tanques de primer tratamiento el azúcar se disuelve y recibe tratamiento de hipoclorito de calcio (sucro balnc), [sic] ácido fosfórico y cal. En estos tanques de primer tratamiento se produce la intervención del primer empleado de la refinería, que es el operador de estos tanques.

Al disolverse el azúcar crudo en estos tanques se produce un licor. Este licor pasa a través de un tamiz vibratorio y por un areador que le incorpora aire, hasta llegar a la estación de clarificadores. En el tamiz vibratorio trabaja otro empleado de la refinería.

Los clarificadores calientan el licor, separan algunas impurezas que se van en la espuma y dan licor claro que se remueve

---

[1-a] Ni la reclamación por salarios inferiores al mínimo, ni la defensa de prescripción invocada originalmente por la interventora presentan controversia alguna que debamos resolver en este recurso.

continuamente. En la estación de clarificadores trabaja otro empleado.

El licor clarificado pasa a los tanques de segundo tratamiento. En los tanques de segundo tratamiento se le añade una porción adicional de hipoclorito de calcio (sucro blanc), carbón vegetal, hidrosulfato de sodio y el agente filtrante. En estos tanques trabaja otro empleado.

El licor tratado es bombeado a través de los filtros. Existen cinco filtros. Cuatro filtros se utilizan para la primera filtración y el quinto filtro se utiliza para la segunda filtración. En las hojas de los filtros queda una torta o cachaza. Esta torta o cachaza es lavada para removerle toda su azúcar probando el agua hasta que esté a cero Baumé (Baumé se denomina un instrumento que indica materia sólida en disolución y mide las cantidades de materia sólida disuelta en el líquido). En los filtros trabaja otro empleado.

La torta o cachaza es removida de los filtros y es bombeada a través de tubos a los filtros Oliver, de la fábrica del azúcar crudo donde se dispone de ella como un desperdicio de la refinería. Dicha torta o cachaza se compone de residuos tales como carbón, material filtrante, tierra, paja, bagazilla y otras impurezas.

El licor, una vez filtrado, pasa hasta los tanques en la estación de los tachos. En los tachos el licor filtrado es concentrado para cristalizar el azúcar. Este producto concentrado es una especie de jarabe ('sirop') mezclado con los cristales del azúcar. A esta mezcla se le denomina 'masa cocida' ('massecuite' o 'strike'). En los tachos trabaja un azucarero de oficio y un ayudante o peón que le asiste en la labor.

La masa cocida pasa a la estación de centrífugas, donde el azúcar es separada del jarabe. En la estación de centrífugas trabaja otro empleado.

El azúcar obtenido pasa a unos tanques y de allí a unos secadores y enfriadores; después de pasar el azúcar por dicho proceso, la misma llega a la estación de envase, donde se vierte en bolsas de papel con la marca 'Blanquita'. En la estación de envase hay un grupo de empleados.

Una vez el azúcar es envasado la misma es transportada hasta un almacén que se encuentra como a cincuenta metros de distancia, en un edificio separado.

En cuanto al jarabe que quedó en las centrífugas una vez fue separado el azúcar, el proceso que continúa es el que se

expone: dicho jarabe es bombeado de nuevo a los tanques de los tachos. En los tachos vuelve a producirse otra masa cocida y en esta masa cocida vuelve a pasar por el procedimiento descrito anteriormente. Vuelve a separarse el azúcar del jarabe. Este proceso se repite aproximadamente cuatro veces, hasta que el jarabe que se produzca quede agotado en cuanto a cristales de azúcar concierne.

El jarabe que subsiste una vez se ha agotado el contenido de cristales de azúcar en el mismo se denomina 'licor retornado' o 'licor de retornos'. Este es un licor sacarino de alta concentración y pureza que carece de valor comercial.

Este 'licor retornado' es bombeado desde las centrífugas a una romana. En esta romana se pesa dicho licor por un empleado de la refinería. Se toma una muestra del mismo y se analiza en el laboratorio. Una vez hecho esto, dicho licor es bombeado mecánicamente a través de una tubería hasta la fábrica de azúcar crudo, a una distancia aproximada de sesenta pies, donde se incorpora el proceso de elaboración de azúcar crudo y mieles en una etapa inicial de dicho proceso.

— B —

El azúcar crudo que entra a la refinería es pesado y analizado y se determina su equivalencia a base de azúcar de 96 grados de polarización. El 'licor retornado' es pesado y analizado y se determina su equivalencia a base de azúcar de 96 grados de polarización. La refinería paga a la fábrica de azúcar crudo el azúcar crudo que utiliza para fines de refinación. Para determinar la cantidad a pagarse se determina la cantidad de azúcar crudo, en su equivalencia de azúcar de 96 grados de polarización que fue bombeada a la refinería, pesada y analizada. A la cantidad resultante se le resta lo que la refinería devolvió a la fábrica de azúcar crudo como 'licor retornado' determinando la equivalencia de dicho licor a base de azúcar de 96 grados de polarización.

— C —

El equipo utilizado en el proceso de refinamiento del azúcar no es utilizado en el proceso de elaboración de azúcar crudo y mieles, existiendo equipo distinto para cada proceso.

— D —

Los empleados que trabajan en la refinería no trabajan en la fábrica de elaboración de azúcar crudo y mieles.

— E —

Tanto la fábrica de azúcar crudo y mieles como la refinería se encuentran dentro de un mismo edificio.

— F —

Las centrífugas de la planta de elaboración de azúcar crudo y mieles están a una distancia aproximada de cinco a seis pies del areador de la planta de refinería siendo ésta la distancia menor entre equipo de una y otra planta.

— G —

La fábrica de azúcar crudo y mieles y la refinería están unidas en dos puntos: (1) la tubería que conduce el azúcar crudo que va a ser utilizado por la refinería hasta la romana-tanque donde la misma es pesada y (2) la tubería que conduce el 'licor retornado' desde la romana donde se pesa dicho licor hasta la fábrica del azúcar crudo y mieles.

— H —

El volumen de 'licor retornado' en comparación con el total de mieles finales para exportación producidas en la fábrica de azúcar crudo fluctúa entre 0.7% y 1.5%.

— I —

El 'licor retornado' no es necesario para la elaboración de azúcar crudo y mieles y es aprovechable en el proceso de elaboración de azúcar crudo y mieles porque contiene sacarina. Dicho licor no tiene valor comercial para la querellada.

— J —

La energía eléctrica que impulsa el equipo tanto de la fábrica de azúcar crudo y mieles como la refinería, proviene de una misma planta eléctrica, cuyas calderas radican en la fábrica de azúcar crudo y mieles. La querellada le paga a los operadores de tales calderas los salarios correspondientes a la fábrica de azúcar crudo y mieles y ninguno de ellos es reclamante en los casos de epígrafe."

■ Como fundamento para su contención de que las horas trabajadas en exceso de 40 y hasta 48 deben ser compensadas a tiempo y medio, los querellantes alegan que, conforme a lo resuelto en *Olazagasti* v. *Eastern Sugar Asso-*

*eiates*, 79 D.P.R. 93 (1956), la Sec. 7(c) de la Ley Federal de Normas Razonables de Trabajo [2] fue adoptada como ley local de Puerto Rico al redactar y promulgar el Decreto Mandatorio Número 3 para la industria azucarera de nuestra Isla. Tienen razón los peticionarios en esta parte de su argumento. Según expresó este Tribunal en *Pan American* v. *Tribunal Superior*, 86 D.P.R. 139, (1962), "la Ley Federal de Normas Razonables rige en Puerto Rico con todas sus disposiciones, excepto que nuestra Asamblea Legislativa le impuso a los patronos cubiertos por dicha ley o comprendidos dentro de las exenciones de la sección 13, 29 U.S.C.A. sec. 213, la obligación de pagar a sus empleados las horas en exceso de ocho diarias y 40 semanales, cuando menos, a razón de tiempo y medio, o, a un tipo mayor, si así lo disponía un convenio colectivo concertado por las partes o un decreto de la Junta de Salario Mínimo aplicable a la industria en cuestión." Esta situación existe a consecuencia y por efecto del *Disponiéndose* del Art. 5 de Ley Núm. 379 de 1948.

Siendo aplicables a la industria azucarera de Puerto Rico las disposiciones de la Ley Federal de Normas Razonables de Trabajo, *Berríos* v. *Eastern Sugar Associates*, 79 D.P.R. 688 (1956), a base de la discusión sobre la relación entre

---

[2] La Sec. 7(c) de la Ley Federal de Normas Razonables de Trabajo, dice así en lo pertinente:

"a) Excepto en tanto en esta sección se disponga lo contrario, ningún patrono empleará a ninguno de sus empleados dedicado al comercio o a la producción de artículos para el comercio durante una semana de trabajo que exceda de 40 horas, a menos que tal empleado reciba compensación por su trabajo en exceso de las horas arriba especificadas a razón de no menos de vez y media al tipo regular de compensación a que está empleado."

"........

"c) En el caso de un patrono dedicado a la elaboración primaria de leche, leche agria, suero, leche desnatada o crema en sus productos derivados . . . o en la conversión de remolacha, mieles de remolacha, caña de azúcar . . . en azúcar (aunque no en azúcar refinada) o en jarabe, las disposiciones del subinciso (a) de este título no serán aplicables a sus empleados no importa el sitio donde éstos se dediquen a tal cosa."

la Ley Federal, el *Disponiéndose* del Art. 5 y el Decreto Mandatorio Núm. 3 que aparece en el caso de *Olazagasti*, supra, resulta que en época de zafra opera en todo su vigor la exención de paga por horas extras de la sección 7(c) de la Ley Federal con respecto a la producción de azúcar crudo, pero dicha exención no se aplica al refinado de azúcar. Sin embargo, esto último está condicionado a que tal actividad resulte en la producción de artículos para el comercio, o sea, que en el caso particular de determinada refinería, el azúcar producida entre al comercio interestatal o extranjero y no se venda exclusivamente en el mercado local como es el caso que nos ocupa, a menos que por otras razones los empleados en cuestión puedan invocar, como en este caso invocan, los beneficios de la Ley de Normas Razonables de Trabajo. A tales efectos sostienen los peticionarios que: 1) su labor estaba relacionada no tan sólo con la producción de azúcar refinada sino también con una especie de miel designada "licor de retorno" que es un licor sacarino de alta concentración y pureza que se devuelve de la planta de la refinería a la de elaboración de azúcar crudo y allí se usa como *una parte o ingrediente* en el proceso de elaboración de azúcar crudo que es un artículo destinado al comercio interestatal y por lo tanto cubierto por la Ley Federal de Normas Razonables de Trabajo, y así lo ha determinado la División de Horas y Salarios del Departamento de Trabajo Federal; 2) la interventora no ha establecido en su Central Santa Juana la completa y absoluta separación, tanto de empleados como de la planta industrial, maquinaria, planta eléctrica, tubería y demás equipo como lo determina la reglamentación promulgada por el Administrador de la referida ley, pues en el caso de dicha central, la planta de refinado y la de azúcar crudo radican bajo un mismo techo, están conectadas por tuberías que llevan materia prima de una a otra y utilizan una planta eléctrica en común.

■ Para que los empleados de una empresa específica puedan ser acreedores de los beneficios que concede dicho es-

tatuto federal es necesario que sus actividades cumplan con los principios o normas que establece la propia ley y que limitan el área de su aplicación. Dicho de otra forma, un empleado tiene que estar dedicado al comercio (*engaged in commerce*) o a la producción de artículos para el comercio (*or in the production of goods for commerce*) y se entiende que está dedicado a la producción de artículo para el comercio si está produciendo, manufacturando, extrayendo, manipulando, transportando o en cualquier otra forma trabajando en dichos artículos, o en cualquier proceso íntimamente relacionado u ocupación directamente esencial para la producción de los mismos en cualquier Estado (*closely related process or ocupation directly essential*). Véanse 29 U.S.C.A. secs. 206 y 207 y la definición de "*produced*" de la sec. 203.

Es obvio que bajo el primer criterio de aplicabilidad de la Ley Federal de Normas Razonables de Trabajo —"engaged in commerce"—los empleados de la refinería no caen bajo la protección de dicha ley. Contrario a la Ley Federal de Relaciones de Trabajo, que funda su aplicabilidad en una base más amplia dejando sentir su impacto sobre aquellas industrias que meramente afectan [3] el comercio interestatal—29 U.S.C.A. sec. 141—la Ley de Normas Razonables de Trabajo funciona en un ámbito más limitado, brindando su protección a aquellos empleados que estén "engaged in commerce or in the production of goods for commerce." 29 U.S.C.A. secs. 206 y 207.[4] Básicamente, los empleados

---

[3] Véase *Labor Board* v. *Reliance Fuel Oil Corporation*, decidido por el Tribunal Supremo de los Estados Unidos en 7 de enero de 1963, donde se extiende la aplicación de la Ley Federal de Relaciones de Trabajo a un distribuidor de combustibles petrolíficos que compraba los mismos dentro del estado de Nueva York a una empresa que decididamente estaba en el comercio interestatal. Se llegó a este resultado a base de la frase "affecting commerce". Véanse, sin embargo, *Parks* v. *Puckett*, d.b.a. *Proctor Potato Chip Co.*, 154 F. Supp. 842 (Ark. 1957) y *Campanale* v. *General Ice Cream Corp.*, 49 N.E.2d 1018 (Mass. 1943).

[4] Véase *Kirschbaum* v. *Walling*, 316 U.S. 517 (1942) donde se hace un análisis comparativo de la diferencia entre el alcance de la Ley de Relaciones de Trabajo y el de la Ley Federal de Normas Razonables. Véase, además, *Labor Board* v. *Reliance Fuel Oil Corporation*, supra,

que reciben los beneficios de la Ley Federal al amparo de la frase "engaged in commerce" son aquellos que se dedican a, o cuyo trabajo está relacionado con el movimiento de personas o cosas (tangibles o intangibles e incluyendo información y material intelectual) entre los distintos Estados o entre un Estado y cualquier lugar fuera del mismo. El Tribunal Supremo de los Estados Unidos ha establecido en varios casos, que la aplicabilidad de la ley basada en "engaged in commerce" se extiende a todo empleado en los *canales* del comercio o en actividades tan íntimamente relacionadas con dicho comercio que, como cuestión práctica, deben considerarse como parte del mismo. *Walling* v. *Jacksonville Paper Co.*, 317 U.S. 564 (1943); *Boutell* v. *Walling*, 327 U.S. 463 (1946). Típicamente quedan incluidos bajo esta norma empleados de las industrias del teléfono, telégrafo, televisión, radio, transportación y navegación ya que estas industrias sirven como los canales verdaderos del comercio interestatal y exterior. También están cubiertos por la referida ley los empleados de empresas bancarias, de seguros, periodísticas y otras que regularmente utilizan los canales del comercio interestatal en el curso de sus operaciones. Véase el Boletín Interpretativo de la División de Horas y Salarios expedido en 1962, 29 CFR Partes 776.8 a 776.11. Aquellos empleados que regularmente se dedican a cargar y descargar embarques interestatales también están cubiertos por la Ley Federal de Normas Razonables. Igualmente se consideran cubiertos los empleados de almacenes y de ciertos mayoristas que se dedican a recibir artículos que provienen del comercio interestatal y a almacenarlos o custodiarlos. Claramente, los empleados de la refinería en cuestión, cuya producción se vendía exclusivamente en el mercado local para consumo en el país, no pueden clasificarse dentro de ninguna de las

en el que se dice que "al aprobar la Ley Nacional de Relaciones de Trabajo, fue la intención del Congreso investir y de hecho invistió a la Junta Nacional de Relaciones de Trabajo con la jurisdicción más amplia permisible bajo la Cláusula del Comercio."

categorías mencionadas, y por lo tanto, no podría decirse que están "engaged in commerce".

■ Una de las dos cuestiones a determinar en el presente recurso es si el hecho de que la refinería le devuelva a la planta de elaboración de azúcar crudo el mencionado "licor retornado" y éste se incorpora en una etapa inicial del proceso de primera elaboración justifica la conclusión de que los empleados de la refinería están dedicados a la producción de artículos para el comercio.

El peso de la prueba descansa sobre los querellantes y debe descargarse por la prueba que aparezca del récord. *Schulte* v. *Gangi*, 328 U.S. 108 (1946).

Descansan los peticionarios para sostener su contención en la definición de la palabra "artículos" (*goods*) que aparece en la sección 3 (i) de la Ley Federal de Normas Razonables de Trabajo. 29 U.S.C.A. sec. 203 (i). Dicha sección habla de "goods . . . or any part or ingredient thereof." Según su argumento, al utilizarse el "licor retornado" en la elaboración de azúcar crudo—un artículo que habrá de entrar en el comercio interestatal—el mismo se convierte en un ingrediente del azúcar crudo y como consecuencia de esto, los empleados de la refinería están dedicados a la producción de artículos para el comercio interestatal. Es cierto que aquellos empleados que se dedican a la producción de ciertos artículos y luego los venden localmente a productores que los utilizan en la producción de artículos "para el comercio" están cubiertos por la Ley Federal de Normas Razonables de Trabajo. *Roland Electric Co.* v. *Walling*, 326 U.S. 657 (1946); *Walling* v. *W.D. Haden Co.*, 153 F.2d 196 (C.A. 5, 1946). Véase además el Boletín Interpretativo de la División de Horas y Salarios Federales, Parte 776.20 (c); 29 CFR Parte 776.20. Sin embargo, la generalidad de los casos que han sostenido dicha conclusión tratan de artículos que en realidad son materia prima o componentes de, o necesarias o están relacionadas estrechamente con, y esenciales a, la producción de aquello que finalmente entra

en el comercio interestatal. En la Parte 776.20 (c) del Boletín Interpretativo, cit supra, se ofrecen ejemplos de estos casos a los que aplica la Ley, y se habla del fabricante de botones que los vende localmente a un fabricante de camisas y éste a su vez vende las camisas en el comercio interestatal. También se menciona al fabricante de madera que la vende a un fabricante de muebles para el comercio interestatal. No hay duda de que tanto los botones como la madera son verdaderos ingredientes de las camisas y de los muebles, respectivamente. En *Romaca* v. *Meyer*, 250 P.2d 347 (Cal. 1952), se trataba de un empleado que trabajaba en la producción de piezas de unidades de radar que eran vendidas a una empresa llamada Dalmo-Víctor donde eran incorporadas a las unidades de radar, siendo éstas vendidas subsiguientemente en el comercio interestatal. Sosteniendo la aplicabilidad de la Ley Federal, se dijo a la página 349: "Sin las piezas en las que trabajaba el querellante y que se vendían por el demandado a Dalmo-Víctor, no existiría unidad de radar alguna para ser enviada a Westinghouse." Aquí se le dio gran importancia al hecho de que las piezas eran necesarias para la producción de las unidades de radar. Véanse además como ilustración del principio general los casos de *Roland Co.* v. *Walling*, supra; *Walling* v. *W.D. Haden Co.*, supra.

Este no es el caso del "licor retornado" con respecto al azúcar crudo, pues según el párrafo I de la Estipulación sometida por las partes se dice que el "licor retornado" no es necesario para la elaboración de azúcar crudo y mieles.

La prueba, consistente en la estipulación previamente relacionada, demuestra que el "licor de retorno" carece de valor comercial, se devuelve a la fábrica de azúcar crudo donde se incorpora el proceso de elaboración de azúcar crudo y mieles en una etapa inicial de dicho proceso, no es necesario para la elaboración de azúcar crudo y mieles y se aprovecha en dicho proceso porque contiene sacarina. El volumen de dicho "licor" en comparación con el total de mieles finales

para exportación producido por la fábrica de azúcar crudo fluctúa entre 0.7% y 1.5% y si se añade a los efectos de la comparación el volumen de azúcar crudo para exportación producido por dicha fábrica, la proporción indicada es aún mucho menor. A los fines de determinar la cantidad a pagar por el azúcar crudo usado como materia prima en la refinería, se descuenta del equivalente en azúcar de 96° de polarización del azúcar crudo, el equivalente en tal azúcar del "licor retornado". Es aparente, por lo tanto, que al incorporar dicho licor a una etapa inicial de la elaboración de azúcar crudo la interventora se beneficia al economizar el posible gasto de botarla, y al reducir el costo del azúcar crudo utilizado como materia prima para el refinado. No se ha demostrado si recibe o no algún otro beneficio del hecho que el "licor" utilizado en la forma indicada "es aprovechable porque contiene sacarina". Pero, la ley en cuestión no provee nada con respecto a beneficio al patrono como base para su aplicación. Por el contrario, en este caso la materia en cuestión no es necesaria para la producción del artículo en el comercio—que en este caso son las mieles y el azúcar crudo—, el volumen de dicha materia es sumamente pequeño en comparación con los artículos en cuestión, y la materia se incorpora al proceso de elaboración, pero el récord no demuestra cómo ayuda, facilita o en cualquier otro modo propende a la realización del proceso o se constituye en parte, componente o queda incluido químicamente o en cualquier otra forma en las mieles o en el azúcar crudo. Por último, el récord más bien demuestra, por la forma de pago que se hace por el azúcar crudo que se usa como materia prima de la refinería, que la incorporación del "licor" a una etapa inicial de la elaboración de azúcar crudo, tiene más bien el carácter de una devolución de materia prima a su fuente original.

El anterior análisis de la prueba nos lleva a la conclusión que los peticionarios no han probado que el "licor" en cuestión es una parte o ingrediente de las mieles o el azúcar

crudo que se transporta y vende fuera de Puerto Rico y, por lo tanto, no han quedado cubiertos por la Ley de Normas Razonables de Trabajo por el hecho de haber trabajado en la elaboración de un producto utilizado como ingrediente en la producción del "licor".

■ Queda por analizar la tercera norma o base para determinar la aplicabilidad de la Ley a determinados empleados—o sea, si dichos empleados se dedican a algún "closely related process or occupation directly essential to the production of goods for commerce".

Antes de que la ley fuese enmendada en 1949 se extendía su aplicación a aquellos empleados que se dedicaran a cualquier proceso u ocupación *necesaria* para la producción de artículos para el comercio. En 1949 se sustituyó la frase "closely related process or occupation directly essential to production of goods for commerce" por la palabra "necessary". Bajo esta enmienda, se requiere que para recibir los beneficios de la ley un empleado se dedique a un proceso u ocupación que reuna ambos requisitos—o sea, que esté íntimamente relacionado (*closely related*) y que además sea directamente esencial (*directly essential*). Véase el Boletín Interpretativo, cit supra, sec. 776.17. El resultado de este cambio ha sido el proveer guías más específicas para determinar aplicabilidad, y como consecuencia restringir el alcance de dicha aplicabilidad. *Mitchell* v. *H.B. Zachry Co.*, 362 U.S. 310 (1960); *Mitchell* v. *W. E. Belcher Lumber Co.*, 279 F.2d 789 (C.A. 5, 1960); *Mitchell* v. *Dooley Bros. Inc.*, 181 F. Supp. 312 (Mass. 1960); *Huke* v. *Ancilla Domini Sisters*, 267 F.2d 96 (C.A. 7, 1959); *Mitchell* v. *S.A. Healy Company*, 190 F. Supp. 897 (Ill. 1959); *Mitchell* v. *Jaffe*, 261 F.2d 883 (C.A. 5, 1958). Ambos conceptos son independientes el uno del otro pudiendo cierta actividad calificarse como "closely related" y por otra parte no ser "directly essential". Hay una gran variedad de factores que hay que considerar para determinar la relación íntima que contempla la ley; mientras que la llamada "direct essentiality" se de-

termina exclusivamente a base de la necesidad funcional que se desprenda de la relación entre la actividad desempeñada por el empleado en cuestión y la producción de artículos para el comercio interestatal. En *Kirschbaum* v. *Walling*, supra, escolio 3, analizando la norma anterior más amplia de "necessary to the production", el Tribunal Supremo Federal estableció lo que vino a ser un criterio muy seguido al determinar que ciertos empleados caían bajo la Ley de Normas Razonables por el hecho de que su trabajo estaba unido al proceso de producción para el comercio por un lazo íntimo e inmediato. ("close and immediate tie.") También se dijo en el referido caso, a la página 523 y se reiteró en *10 East 40th St. Co.* v. *Callus*, 325 U.S. 578 (1945): "A diferencia de la Ley de Comercio Interestatal y de la Ley Nacional de Relaciones de Trabajo y de otra legislación similar, la Ley de Normas Razonables de Trabajo le impone a los tribunales la responsabilidad independiente de aplicar 'ad hoc' los principios generales de dicho estatuto a una gran variedad de complejas situaciones industriales". Todo lo cual indica que la determinación de si cierta actividad está íntimamente relacionada o si es directamente esencial a la producción de artículos para el comercio es una cuestión de grados y a la que debe llegarse luego de un análisis de los hechos de cada caso, y teniendo en mente el criterio introducido por las enmiendas del 1949.

Generalmente, el criterio de "closely related and directly essential" se aplica para cubrir las llamadas actividades productivas marginales (*fringe production activities*) tales como mantenimiento, trabajo clerical, reparaciones a la maquinaria y otras que sin constituir actividades productivas en el sentido estricto de la palabra, son tan necesarias para una producción eficiente y continua que de faltar las mismas no sería posible dicha producción. *Mitchell* v. *Hooper Equipment Co.*, 279 F.2d 893 (1960). Véase el Boletín Interpretativo, cit. supra, Secs. 767.17 y 767.18. La relación entre la actividad realizada por el empleado en cuestión y la produc-

ción para el comercio interestatal, medida tanto en términos físicos como en términos funcionales, no debe ser ni remota ni tenue. Cf. *Mitchell* v. *H.B. Zachry*, supra; *Mitchell* v. *Hygrade Water & Soda Company*, 285 F.2d 362 (C.A. 8, 1960); *Mitchell* v. *Belcher Lumber Co.*, 279 F.2d 789 (C.A. 5, 1960); *Walling* v. *Peoples Packing Co., Inc.*, 132 F.2d 236 (C.A. 10, 1942).

■ En ciertas situaciones el alcance de la frase que analizamos se ha extendido hasta cubrir la producción interestatal de ciertos artículos que se utilizan en la producción de artículos para el comercio interestatal ya sea como envases, combustibles, herramientas, tintes, etc. Véase el Boletín Interpretativo, cit. supra, sec. 776.19. De esta manera se han incluido como empleados cubiertos por la ley los de una compañía manufacturera de hielo que le suplía hielo a compañías dedicadas a empacar camarones para el comercio interestatal para la refrigeración de los camarones. *Mitchell* v. *Independent Ice & Cold Storage Company*, 294 F.2d 186 (C.A. 5, 1961). Se hizo hincapié en este caso en que el hielo era suplido a las empacadoras de camarones en intervalos frecuentes, regulares y en cantidades sustanciales. En *Tobin* v. *Colby Cheese Box Co.*, 10 W.H. Cases 422 (Wis. 1951) se le aplicó la ley federal a empleados de un manufacturero de cajas de madera utilizadas para empacar queso regularmente vendido en el comercio interestatal. Se dijo que el manufacturero de las cajas razonablemente debía saber que dichas cajas saldrían del estado y que además las actividades de los empleados que fabricaban las cajas estaban tan íntimamente identificadas con la producción de queso que existía un lazo íntimo e inmediato. (*close and immediate tie.*)

Cobran importancia en relación con lo anterior dos doctrinas adicionales que tanto el Administrador de la División de Horas y Salarios como los tribunales han utilizado con el propósito de establecer guías meridianamente claras para determinar la aplicabilidad de la ley federal a base del criterio de *"closely related or directly essential"* o del criterio

anterior de *"necessary"* que ya hemos visto que era más amplio. En primer lugar, se dice que a pesar de que el negocio de un patrono que le suple ciertos artículos a productores de artículos para el comercio interestatal sea esencialmente local, sus empleados estarán cubiertos por la ley si dicho patrono tenía base razonable para anticipar que cantidades sustanciales de su producción entrarían en el comercio interestatal. Cf. *Shulte Co.* v. *Gangi*, supra; *Mitchell* v. *Hooper Equipment Company*, supra; *Mitchell* v. *Jaffe*, supra; *Tobin* v. *Celery City Printing Co.*, 10 W.H. Cases 682; *Walling* v. *Hamner*, 64 F. Supp. 690 (Va. 1946); *Romaca* v. *Meyer*, supra.

En segundo lugar, aplicando la máxima de *"de minimis non curat lex"* algunas cortes han rehusado imponer la ley federal para cubrir empleados cuya participación en el proceso productivo para el comercio interestatal es de un grado inconsecuente, trivial o infinitesimal. Sin embargo, es doctrina generalmente aceptada que el volumen o porcentaje de la producción de un patrono que entra en el comercio interestatal es sólo uno de los factores a considerar para determinar la aplicabilidad de la ley. *Goldberg* v. *Worman*, 37 F. Supp. 778 (Fla. 1941). A base de la doctrina establecida en *Mabee* v. *White Plains Publishing Co.*, 327 U.S. 178 (1946), y a base de que la ley y en sus Secs. 6 y 7 habla de "cada" (*each*) y de "cualquier" (*any*) empleado, y en la Sec. 15 (a) prohibe la introducción en el comercio interestatal de "cualesquiera" (*any*) artículos, en un gran número de ocasiones las cortes se han negado a aplicar la doctrina de *"de minimis"*. *Mitchell* v. *Sucrs. de A. Mayol & Co.*, 166 F. Supp. 184 (P.R. 1958). Por otra parte, el principio general de que las cortes son responsables de interpretar la referida ley a la luz de los hechos de cada caso en particular, ha llevado a las cortes a invocar la doctrina de *"de minimis"* en ciertos casos en que se justificaba. Cf. *Hunter* v. *Madison Avenue Corporation*, 174 F.2d 164 (C.A. 6, 1949); *Hill* v.

*Jones,* 59 F. Supp. 569 (Ky. 1945); *Zehring* v. *Brown Materials,* 48 F. Supp. 740 (Cal. 1943).

De las consideraciones precedentes hemos de concluir que los peticionarios tampoco pueden justificar la aplicabilidad de la Ley de Normas Razonables de Trabajo por la razón de estar dedicados a "algún proceso estrechamente relacionado u ocupación directamente esencial" con la producción de mieles y azúcar crudo de la que su patrono, o sea la interventora, dispone "en el comercio".

■ La segunda razón invocada por los peticionarios es que la interventora no ha establecido en su Central Santa Juana la completa y absoluta separación tanto de empleados como de la planta industrial, maquinaria y demás equipo. La prueba sobre este particular, según aparece de la estipulación demuestra que: 1) los querellantes no trabajan en la producción de azúcar crudo y mieles, 2) existía equipo distinto para el proceso de producir azúcar refinado y para producir azúcar crudo y mieles (aunque ambos estaban bajo un mismo techo) excepto que la misma planta eléctrica suplía energía para impulsar ambos tipos de equipo; sin embargo, los obreros querellantes no trabajaban en nada relacionado con dicha planta, es más, los operadores de dicha planta recibían los mismos jornales correspondientes a la producción de azúcar crudo y mieles; y, por último, 3) las dos fábricas estaban unidas sólo por la tubería que suplía el azúcar crudo utilizado para producir el refinado y la que conducía el "licor retornado" a la fábrica del crudo. La alegada falta de segregación se basa, pues, en la existencia del techo, y planta eléctrica común a ambas fábricas, en las tuberías en cuestión y, por último, en el hecho de que parte del azúcar crudo producido se utilizaba como materia prima del refinado. No hemos encontrado caso alguno que sostenga la contención que, a la luz de los hechos indicados, no pueda existir la segregación absoluta indispensable que saca a los peticionarios del ámbito de la Ley de Normas Razonables de Trabajo. Los casos resueltos sobre esta cuestión se re-

fieren a la falta de segregación en las actividades mismas de los obreros. La cuestión de segregación, a nuestro juicio, se determina a base de la naturaleza de las actividades de los trabajadores y no exclusivamente a base de determinadas situaciones del estado físico del equipo y maquinaria y del lugar en que están emplazados, en relación con lo cual los peticionarios no realizaban actividad ocupacional alguna. El hecho de que azúcar crudo que se vende en el mercado interestatal se produzca en una central azucarera en la cual también está localizada otra planta que mediante el uso de parte de dicho azúcar crudo como materia prima produce azúcar refinado para el mercado local de por sí no afecta el carácter de la actividad del obrero que se dedica a la producción del refinado para el comercio local al extremo de por ese solo hecho incluido bajo las disposiciones de la Ley de Normas Razonables de Trabajo, contrario a lo que ocurre en el caso de la Ley de Relaciones del Trabajo la cual, como ya hemos indicado, tiene un alcance mayor y más abarcador que la anterior. Cfr. *Kirschbaum* v. *Walling*, supra, escolio 4; *Labor Board* v. *Reliance Fuel Oil Corporation*, supra, escolio 3.

En el caso ante nos se dan, a nuestro juicio, cuatro razones para negar la aplicabilidad de la Ley Federal de Normas Razonables a los empleados de la refinería de azúcar, a saber: 1) la naturaleza del negocio y el fin primordial de la producción del azúcar refinado son esencialmente locales, y no se ha demostrado ni el hecho ni la intención de que el azúcar refinado entre en el comercio interestatal en ninguna forma; 2) el "licor retornado" es a lo sumo un producto subsidiario [5] y si bien es cierto que es incorporado en una

---

[5] En *Goldberg* v. *Everbest Meat Products Inc.*, 42 L. C. ¶ 31,133 (1961) se sostuvo la aplicabilidad de la ley federal a empleados de una compañía de productos de carne cuyos "by products" entraban en el comercio interestatal luego de ser procesados e incorporados en otros artículos por las compañías procesadoras que los compraban. Este caso es distinguible ya que aquí quedó establecido que los "by products" entraban al comercio interestatal como parte de otros productos. Cf. *Mitchell* v. *P. R. Dehydrating and Feed Corp.*, 38 L.C. ¶ 66,024 (1959).

etapa inicial del proceso por la planta de elaboración de azúcar crudo, el mismo no es indispensable ni necesario para dicho proceso, consistiendo en cierto sentido en una devolución de materia prima de la refinería a la planta de azúcar crudo y mieles; 3) el volumen de "licor retornado" en comparación con el total de mieles finales para exportación producido en la fábrica de azúcar crudo fluctúa entre 0.7% y 1.5% (y sería indudablemente menor si se incluye el azúcar crudo en la comparación) acentuando así lo innecesario que es para dicha producción; y 4) en la estipulación sometida por las partes quedó establecido—y así lo determinó el juez de instancia—que existía completa segregación entre las actividades locales y las interestatales de la interventora. Cf. *Agosto v. Rocafort*, 9 L. C. ¶ 62,610 (1945) ; *Carter v. Royal Crown Bottling Co., Inc.*, 7 L.C. ¶ 61,951 (1943) ; *Fleming v. Atlantic Co.*, 40 F. Supp. 654 (Ga. 1941). Además, según se desprende de la estipulación sometida, los peticionarios para nada intervienen con la producción del azúcar crudo para el comercio interestatal. La aplicabilidad de la Ley de Normas Razonables se determina no por la naturaleza del negocio del patrono, sino por el carácter de las actividades del empleado. *Mitchell v. Hooper Equipment Company*, supra; *Mitchell v. Anderson*, 235 F.2d 638 (C.A. 9, 1955).

*La concurrencia de estos hechos, considerada a la luz de los principios arriba enunciados, hace inescapable la conclusión de que los empleados de la refinería operada por la interventora no están cubiertos por la Ley Federal de Normas Razonables de Trabajo. Debe, por lo tanto, confirmarse la resolución recurrida.*

---

## EN MOCION DE RECONSIDERACION

San Juan, Puerto Rico, a 31 de mayo de 1963

El Juez Asociado Señor Ramírez Bages emitió la opinión del Tribunal.

Tanto los peticionarios como el Departamento del Trabajo de Estados Unidos como *amicus curiae* en este caso so-

licitan la reconsideración de la sentencia de 20 de febrero de 1963 de este Tribunal en el caso de autos y a esos efectos sostienen que:

 1) La mera demostración de que ciertos empleados se dedican a la producción de un artículo que se mueve en el comercio interestatal constituye un caso *prima facie* para la aplicación del criterio de "producción de artículos para el comercio" contenido en la Ley Federal de Normas Razonables del Trabajo; por lo tanto era innecesario que el récord demostrara el valor especial o uso especial del *licor de retorno*. Este argumento parte de una premisa errónea, ya que el récord no demostró que los empleados de la refinería estuviesen dedicados a la producción de un artículo que se mueve en el comercio interestatal. *Schulte* v. *Gangi*, 328 U.S. 108 (1946). 2) Al incluirse el término ingrediente en la definición de "artículo para el comercio" contenida en la Sec. 3 (i) de la Ley de Normas Razonables del Trabajo (29 U.S.C.A. sec. 203 (i) ) no se expresa limitación alguna, indicando con esto que el mero hecho de que una substancia se una a otra que entra en el comercio interestatal es suficiente para que la ley sea aplicable. En otras palabras, que es impertinente e irrelevante el papel que desempeñe el *licor de retorno* en el proceso de elaboración del azúcar crudo. En apoyo de lo anterior se citan, entre otros, los siguientes casos: *Mitchell* v. *Royal Baking Company*, 219 F.2d 532 (C.A. 5, 1955); *Walling* v. *W. P. Haden Co.*, 153 F.2d 196 (C.A. 5, 1946); *Reynolds* v. *Salt River Valley Water Users Ass'n*, 143 F.2d 863 (C.A. 9, 1944); *Walling* v. *People's Packing Co.*, 132 F.2d 236 (C.A. 10, 1942); *Warren Bradshaw Drilling Co.* v. *Hall*, 124 F.2d 42 (C.A. 5, 1941). Un estudio de las opiniones emitidas en estos casos demuestra que el tribunal en cada uno de ellos tomó en consideración precisamente el papel que desempeñaba el artículo en cuestión en la producción de aquel que entraba en el comercio interestatal. Veamos:

En *Mitchell* y *Royal Baking Company*, supra, se resolvió que ciertos empleados de una firma elaboradora de productos de repostería vendidos localmente a ciertos establecimientos que preparaban con ellos emparedados para venderlos a líneas aéreas estaban cubiertos por la Ley de Normas Razonables de Trabajo. Algunos de los productos eran vendidos en el comercio interestatal sin alteración alguna. La corte recalcó el hecho al aplicar la referida ley federal, de que Hot Shoppee Caterers (uno de los compradores) era un "comprador consecuente de cantidades sustanciales de productos de repostería." Anualmente se le vendía a este comprador $57,400.51 en productos de repostería y 30% de esta cantidad era elaborado para comidas en los aviones.

En *Walling* v. *W.P. Haden Co.*, supra, se resolvió que dicha ley federal cubría a empleados de una empresa que vendía conchas de ostras usadas luego para producir cal y abonos vendidos en el comercio interestatal, ya que el comprador de las conchas producía cal y cemento directamente de este producto, o sea que la concha en este caso era la materia prima utilizada en la producción de cal y cemento, y la usaba como agente catalítico en su producción de magnesio.

Comenta el *amicus curiae* que hasta el agua que de ordinario se considera como sin valor intrínseco alguno se ha calificado de artículo (goods), según la definición estatutaria. A estos efectos cita el caso de *Reynolds* v. *Salt River Valley Water Users Ass'n*, supra, donde se resolvió que la citada ley federal cubría a empleados de una compañía de riego que suplía agua a agricultores accionistas que operaban en un valle. Sin embargo, para justificar el alcance de dicha ley, el tribunal se expresó en la siguiente forma, a la página 867: *"Aquí, el agua de riego no solamente es una causa sine qua non, sino una de las varias causas próximas del crecimiento vegetal. Su relación inmediata e íntima es obvia."* (Enfasis nuestro.)

*Walling* v. *People's Packing Co.*, supra, sostiene la aplicabilidad de la ley federal en cuestión a ciertos empleados de una firma que vende despojos de reses localmente para ser embarcados luego por los compradores en el comercio interestatal en la misma forma o en una alterada, o sea, como materia prima en la producción del jabón, abonos y lubricantes. A la página 239 concluyó el tribunal:

"
. . . . . . . .

*Aquí, sin embargo, las pieles de color, los abonos, los lubricantes y los jabones resultantes del proceso al que eran sometidos las pieles y los despojos, nunca se hubieran podido producir si los empleados de People's Co. no le hubieran quitado las pieles a los animales matados ni separado y obtenido los despojos de las reses muertas.*" (Énfasis nuestro.)

■ Finalmente se cita a *Warren Bradshaw Drilling Co.* v. *Hall,* supra, para fundamentar la teoría de que la citada ley federal cubre la producción de ciertos artículos cuando éstos entran en los canales del comercio en su forma inalterada, sufriendo alteraciones o como partes o ingredientes de otros artículos. Este caso no ilustra el principio enunciado. Aquí se trataba de empleados miembros de brigadas que perforaban pozos de petróleo para particulares. El petróleo entraba en el comercio interestatal. El tribunal determinó que estaban dedicados a la producción de artículos para el comercio. Dictaminó la corte, a la página 44 de su opinión:

"En la operación práctica de la industria del petróleo, nadie aceptaría la posición de que las brigadas de perforación rotativa no son parte de la producción de petróleo y que dichas brigadas no son parte de las fuerzas de campo realmente dedicadas a la producción del petróleo."

Dos puntos adicionales plantea el *amicus curiae:* primero, alega que la regla "de minimis" no es criterio para resolver un caso como éste; y segundo, ataca nuestra teoría de que la devolución del licor de retorno es de la naturaleza de una restitución de materia prima de la refinería a la

planta de elaboración de azúcar crudo y mieles. En el primer planteamiento tiene razón en principio. Sin embargo, la mención de esa regla no fue decisiva en nuestra opinión. Meramente expresamos que el hecho de la cantidad exigua del volumen del *licor retornado* en comparación con el total de mieles finales acentuaba lo innecesario que es aquél para la producción de éstas. Con respecto al segundo punto, la opinión no resuelve que la devolución del licor de retorno fuese una devolución de materia prima sino que participaba en cierto sentido de esa naturaleza.

 Sostiene en su alegato el *amicus curiae* que la enmienda de la ley en 1949 sustituyendo la frase "closely related or directly essential" por la palabra "necessary" como proveía antes la ley tuvo como consecuencia ampliar el alcance de la ley. Ciertamente se amplió dicho alcance, pero fue en el sentido de que luego de las enmiendas la ley cubre claramente las llamadas actividades productivas marginales tales como mantenimiento, trabajo clerical y reparaciones. *Mitchell* v. *Hooper Equipment Co.*, 279 F.2d 893 (C.A. 5, 1960). Pero como se dijo en nuestra opinión a la página 416, el resultado neto en cuanto a empleados dedicados a la producción propiamente fue restringir el alcance de la ley proveyendo guías más específicas. Véase el Boletín Interpretativo de la División de Horas y Salarios Federales, 29 CFR Parte 776.17. De todos modos, lo cierto es que las consecuencias de estas enmiendas se discutieron en la opinión no como base para determinar definitivamente que el *licor de retorno* no era un ingrediente, sino más bien como un signo indicativo o guía de interpretación.

 Los peticionarios por su parte plantean el argumento de que es de conocimiento general que el valor de un producto en la elaboración de azúcar depende de su facultad para endulzar y que el *licor de retorno* es un producto de alta concentración que contiene sacarina, substancia que por definición en la enciclopedia tiene un poder de endulzar cientos de veces su peso de azúcar. La falla en este argumento

es que los peticionarios no demostraron el efecto que producía la sacarina en el *licor de retorno*. Aunque podemos tomar conocimiento de que la sacarina es un endulzante poderosísimo no podemos tomar conocimiento de que el *licor de retorno* al devolverse al proceso inicial del azúcar crudo tuviese por consecuencia necesariamente que facilitar en alguna forma, o ser necesario o esencial a, o estar íntimamente relacionado con, la producción del azúcar crudo, pues si bien se dijo que dicho licor es aprovechable en el proceso de elaboración de azúcar crudo por contener sacarina, las partes estipularon, sin embargo, que dicho licor no era necesario para la producción de azúcar.

Por todo lo expuesto reiteramos que la mera incorporación del licor de retorno al proceso de elaboración de azúcar crudo y mieles en una etapa inicial de dicho proceso, sin demostración alguna de su esencialidad al, o relación íntima con el proceso de manufactura de azúcar crudo, no es razón en la que se pueda apoyar la aplicabilidad de la Ley de Normas Razonables de Trabajo.

*Se declara sin lugar la moción de reconsideración.*